# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

SHARON LYNN TEDFORD,

                Plaintiff,

vs.

CAROLYN W. COLVIN, Commissioner
of Social Security,

                Defendant.

No. C12-4076-LTS

**MEMORANDUM**
**OPINION AND ORDER**

---

## *Introduction*

Plaintiff Sharon Tedford seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DIB) pursuant to Title II of the Social Security Act, 42 U.S.C. § 405(g). Tedford contends the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she is not disabled. For the reasons explained below, the Commissioner's decision is reversed and remanded.

## *Background*

Tedford was born in 1960 and completed high school. AR 30-31. She previously worked as a cashier, sales attendant, maintenance repairer for a building, change person, and assistant manager of a retail store. AR 31-32, 318. Tedford protectively filed for DIB on July 14, 2009, alleging disability beginning on November 26, 2004,[1] due to a stroke and seizures. AR 200-01, 205. Her claims were denied

---

[1] The record is unclear as to Tedford's alleged onset date. During the administrative hearing, the ALJ confirmed that she had changed that date to March 2009, which is the date she last worked. AR 29. However, in his decision, the ALJ considered her original onset date of

initially and on reconsideration. AR 67-68. She then requested a hearing before an Administrative Law Judge (ALJ). AR 80-81. On November 3, 2010, ALJ Ronald Lahners held a hearing via video conference during which Tedford, Tedford's husband, and a vocational expert (VE) testified. AR 26-66.

On April 26, 2011, the ALJ issued a decision finding Tedford not disabled since November 26, 2004. AR 7-19. Tedford sought review of this decision by the Appeals Council, which denied review on July 17, 2012. AR 1-3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. § 404.981.

On August 1, 2012, Tedford filed a complaint in this court seeking review of the ALJ's decision. On August 20, 2012, with the parties' consent, the case was transferred to me for final disposition and entry of judgment. The parties have briefed the issues and the matter is now fully submitted.

## Summary of Evidence

### A.    Dr. Luis Pary

On November 25, 2004, Tedford was taken to the emergency room for a sudden onset of unilateral dysarthria, dysphasia and weakness. AR 467. Luis Pary, M.D., recommended aggressive tissue plasminogen activator (t-PA), which is used to treat people who are having a stroke. This resolved her symptoms. Follow-up testing revealed an unclear etiology, or cause, for this episode. AR 467. On December 18, 2004, Tedford was taken to the emergency room because she felt weak on her left side, her face drooped, she was in and out of consciousness and she could not walk. AR 527. A CT scan came back negative and her neurological exam was completely normal. An EEG, MRI, and other tests were also performed that came back normal. AR 530. Dr. Pary, a neurologist, noted that the nature of her symptoms was probably psychogenic and that she might have a somatoform disorder. AR 531. He reviewed

---

November 26, 2004. AR 10, 29. I will consider the earlier date since that is the date cited in the ALJ's decision. AR 10, 19.

2

the extensive workup that had been done and noted there was no evidence of brain pathology or neurological disorder that could be causing her symptoms. *Id.*

### B. Mayo Clinic

In August and September 2007, Tedford began seeing Jeffrey Krohn, M.D., at Mercy Medical Center for recurrent transient ischemic attacks (TIAs), or mini-strokes. AR 582-87. After performing several tests that revealed normal results and no potential cause for her symptoms, Dr. Krohn referred Tedford to the Mayo Clinic for a neurology consultation with Jimmy Fulgham, M.D., on October 1, 2007. AR 596-98.

Tedford reported to Dr. Fulgham that she was having episodes three to four times per week where the left side of her face would become numb and droopy and her fingers would flex. AR 596. The episodes would last from a few minutes up to an hour. Tedford's husband noted that sometimes during these episodes her mouth would open, her tongue would extend out and her eyes would roll up. *Id.* She was unresponsive during these episodes and afterward she would feel very tired. Dr. Fulgham noted there had been no incontinence or tongue biting. *Id.* He also considered her history of migraines. *Id.*

Dr. Fulgham ordered tests, which all came back negative. AR 594. He told her it was possible for someone to have a seizure disorder and a normal EEG. *Id.* He did not believe her spells were due to a blood clot. Nor was he able to entirely exclude a migrainous event as the cause of her symptoms because of Tedford's history with migraines. He recommended she take Topamax. *Id.*

### C. Siouxland Community Health Center

Tedford's current primary care doctor is Jonathan Taylor, D.O., at Siouxland Community Health Center. In September 2009, she told Dr. Taylor that she had been stopped at a stoplight and someone approached the window of her car because she had been sitting at the light through multiple cycles of the light changing. AR 752. She

3

said she was a little foggy after the incident, but drove fine. Dr. Taylor thought sleep deprivation was most likely, followed by possible seizure, followed by TIA. *Id.* He recommended someone drive her for the next few months while her stress level was high. Dr. Taylor also noted that she had not been using her CPAP machine due to financial reasons and recommended she sleep on her side in the meantime. *Id.*

On November 3, 2009, Tedford reported she had had four seizures that day and had fallen during one earlier in the week. AR 787. She felt like the Topamax was not working, but Dr. Taylor recommended she continue it because it was likely helping with her headaches too. *Id.* He indicated that he was not sure if her episodes were actually seizures. *Id.*

In December 2009, her EEG results were normal. AR 785. She had recently experienced shaking during her episodes, which would last about two minutes. She said she had been lying down when it happened and there never seemed to be any specific pattern to her episodes. *Id.*

In March 2010, Tedford was able to use a CPAP machine again. AR 783. In August, she reported she had been using it intermittently and "a little bit better than before." AR 775. Dr. Taylor wrote that she had been doing housework and a little bit of yardwork, but she had difficulty lifting her grandchildren of two months and two years old. *Id.*

In September 2010, she was regularly using her CPAP machine again, but would only sleep four to five hours before taking it off. AR 773. Tedford reported a high stress level and said she was experiencing seizures about twice per week. *Id.*

### D.    *State Agency Consultants*

Rene Staudacher, D.O., performed a physical residual functional capacity (RFC) assessment on September 14, 2009. AR 739-46. Based on her review of the record, she found that Tedford could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, could stand and/or walk and sit about six hours in an eight-

4

hour workday, and had unlimited pushing and/or pulling capabilities other than her lifting/carrying limitations. AR 740. She could occasionally climb, balance, stoop, kneel, crouch and crawl. AR 741. She was limited in her ability to reach overhead on the left side, but unlimited in handling, fingering and feeling. AR 741-42. She did not suffer any seizures from December 2008 to April 2009. *Id.* Dr. Staudacher also noted that Tedford's "spells" were not confirmed as seizures by the objective medical evidence. Even if they were, she did not think they would be of listing level equivalency in frequency or severity. *Id.* She thought that certain hazards should be avoided even though the "spells" had not been clearly defined, and that Tedford would be capable of working within the RFC provided. *Id.* On reconsideration, Laura Griffith, D.O., affirmed this RFC as written. AR 769.

Herbert Notch, Ph.D., performed a psychiatric review technique on August 7, 2008. AR 699-712. He noted that there were no medically determinable mental impairments based on his review of the medical evidence. AR 711. Tedford was currently working at Kum-N-Go and her supervisor noted that in the areas of adapting to changes in the workplace and managing workplace stress she was "poor" but in all other areas she was rated "adequate" or better. *Id.*

### E. *Consultative Examinations*

Blanca Marky, M.D., performed a consultative physical examination on December 21, 2010. AR 794-99. Dr. Marky reported the following impression:

> Pseudoseizures. The story that she and her husband relate around the seizure is of a partial seizure on the left side. The patient herself has stated that the day she had a stroke she had a nodule in her left neck that disappeared the day that they gave her the t-PA. I confronted her telling her that if she had a stroke on the left side of her body the affected side would be her right side and not her left side and she said that she knew that but still she maintains that she had a stroke even though she has been told by Dr. Luis Pary and another neurologist that she did not have any strokes or any

5

scar of strokes or any structural cause for having epilepsy in the past.

The typical history of seizures is a convulsion that lasts for 90 seconds at most and has a recovery or postictal period of 20-30 minutes typically and of course it is not possible to have several a day, only if the patient has status epilepticus and she does not have any medication. So the history that she is giving is not very good on one side. On the other side I am not able to find any sign of weakness on the left side that she stated that is affected by the seizure. She keeps her left hand in a fist. But I saw her extend her hand completely during the exam when she was distracted.

I do not think that this patient needs any kind of disability. She does not have a real history of stroke even though she was given alteplase but sometimes one of the problem[s] that we neurologists had with tPA administration or alteplase, is the time constraint of three hours after the symptom onset and so most likely this patient was reaching these three hours so Dr. Pary most likely could not wait to have the MRI that is not always available to make his full diagnosis so that is why she was given alteplase and most likely she was going to improve anyway. There is no sign of stroke in the distribution of her right MCA to prove that this patient had stroke. In regards to the seizure, if she had a stroke then partial motor seizures can be explained but in motor partial seizures there is no loss of consciousness because they are only partial motor and they are very easy to control and of course they do not last for 30-45 minutes and they are not followed by any sleepiness. Sometimes they are but not for one hour. I think that this patient has pseudoseizures, migraines, that is her diagnosis and I really do not think she needs to be on disability.

AR 798-99.

Michael Baker, Ph.D., performed a consultative mental examination on December 7, 2010. AR 804-11. He found she only had mild limitations in work-related mental activities and diagnosed her with somatization disorder. AR 804-05, 811. He reported the following impression:

6

In regards to mental limitations related to work activities, this client would have the ability to remember and understand instructions, procedures and locations for non-complex type employment. She would also have the ability to maintain adequate attention, concentration and pace for carrying out instructions in similar work. Past history of employments indicate varying degree of ability to interact appropriately with supervisors, coworkers and the public. She reports being let go from a couple of jobs, but she reports that was due to reported mistakes having to do with counting money and mathematics. At the same time, she maintained other employments that indicated ability to interact appropriately overtime. In regards to normal changes necessary in the workplace, if not too stressful, she should be able to respond with adequate judgment.

AR 811.

## *Hearing Testimony*

Tedford testified that she felt she could not work because her left hand curled, she had seizures, poor concentration, and was "slow at things." AR 31. In the past 15 years, she had worked as a cashier, sales attendant, maintenance repairer for a building, change person, and assistant manager of a retail store. AR 31-32.

When asked about the most serious problem that interferes with her ability to work, Tedford said, "Counting. I'm slow. Standing, I can't stand for long periods of time. Lifting. A lot of walking I cannot do anymore." AR 32. She also indicated she had seizures, which were not under control with the medication she took for them and her migraines called Topamax. She was prescribed Topamax by Dr. Fulgham at Mayo Clinic and the prescription had been slowly increased. AR 34-35.

Tedford explained that she would still experience migraines that lasted for about six hours. She would get nausea and have to go into a dark room. She has seizures two to three times a day that lasted up to 15 minutes. AR 36-37. She said she could not tell when one was coming on and her doctors did not know what was causing them.

7

*Id.* Tedford testified she had a stroke in 2004 and since then she has had problems with her left hand and arm. She keeps her left thumb tucked in with her fingers curled around it and she is unable to open her hand completely or grasp or carry items with it. AR 37-38. She also had difficulty raising her left arm. Tedford explained that she has tried to compensate for this limitation in her past jobs by only using her right hand. AR 39. She did not think she could go back to work as a slot technician or change person at a casino because it required use of both hands. AR 41. She also could not go back to maintenance work because it required climbing ladders and pushing and pulling. *Id.*

Tedford testified she has also had difficulty with memory and concentration since her stroke. As an example, she said that when she was working at Dollar General her drawers were never balanced and she had difficulty making change. She had been let go at two different jobs because she could not keep up with the pace, her drawers would come up short and she was unable to work the full eight hours. AR 40-41.

Tedford's other limitations include sleep apnea, shoulder pain and back pain. AR 42-45. Her sleep apnea requires her to use a CPAP machine at night. AR 42. The ALJ asked about her compliance with the machine because the record indicated she would wear it up to three hours then take it off. AR 50. Tedford testified she uses it every night, but admitted she would sometimes take it off so that she could fall asleep. *Id.* She said she slept four to five hours each night and would also sleep during the day. AR 43. Her shoulder pain is caused by arthritis and prevents her from lifting. AR 44. She also experiences back pain after standing for a half hour. AR 45.

Many of Tedford's daily activities are limited due to her seizures. She babysits her grandchildren, but only when her husband is present. AR 43-44. She has been instructed by her doctor to refrain from driving. AR 44. Around the house she helps with dishes and will cook food using the microwave but not the stove, fearing that she may unexpectedly have a seizure. AR 45. She spends most of her day sitting or lying

down watching television. AR 46. She tries to limit her activity when her husband is not around to prevent falling to the floor in case of an unexpected seizure. *Id.*

The ALJ asked Tedford about some inconsistencies between her testimony and her treatment records. A treatment record from September 22, 2010, stated that Tedford was having seizures twice a week as opposed to two to three times per day as she testified. AR 47. Tedford explained her seizures were not getting better or worse and she has told the doctor how many seizures she has a day. AR 48. The ALJ also referenced a treatment record that said Tedford likes to ride her bike. AR 49. Tedford said she has not been on a bike since 2004. *Id.* A treatment note from August 2010 noted that Tedford was doing housework and yard work. Tedford said that was not true. *Id.* Tedford disagreed with her doctor's assessment of her condition, but said she could not switch providers due to lack of insurance. AR 50.

Tedford's husband also testified at the hearing. AR 52. He and Tedford have been married since 1995 and he works part-time as a shuttle driver for a casino. He is on disability for a heart condition. AR 53. He testified that when Tedford has a seizure, her left hand curls, her tongue protrudes out, the left side of her face droops down, and she curls into a ball. AR 54. The seizure lasts five to fifteen minutes. *Id.* When she comes out of the seizure, she will talk for a little bit and then fall asleep for about a half hour. AR 54. He noted there are days when she does not have seizures, but they can happen three to four times a day. AR 55. He explained there did not seem to be any indication of when they would start, but he has noticed she has them more often. They started after her shoulder surgery, but he could not recall whether that was in 2009 or 2004. AR 57-58. He has called the doctor in the past, but they have informed him not to bring her into the hospital unless the seizure lasts longer than usual. AR 56. He has also noticed that his wife's memory is getting worse and she will frequently repeat herself in conversations. *Id.*

The ALJ provided the VE with the following hypothetical:

> Let's assume that we have someone such as the Claimant,
> someone of the same age, education and past work history
> both as to exertional as well as skill letters, with any
> transferable skills that come from her previous types of
> employment. Then further with these limitations, if such a
> person could lift up to 20 pounds on occasion, 10 pounds on
> a frequent basis. Could in an eight hour day stand for six
> hours, sit for six hours, and has some limited range of
> motion with the left arm, so should not be doing overhead
> left arm reaching.
>
> The left hand could not be used for fine fingering. Such a
> person could occasionally bend, stoop, kneel, and crawl,
> should avoid exposure to open machinery and certainly stay
> away from all heights such as ladders and scaffolds, getting
> up on any kind of height. Scaffolds, getting up on any kind
> of heights should not be done. With such limitations would
> there be any of the Claimant's past relevant work that could
> be accomplished?

AR 60. The ALJ clarified that the left hand could still be used as an assist even though it was restricted from overhead reaching and fine finger dexterity. *Id.* The VE testified that such an individual would be able to perform past relevant work as a cashier and a sales attendant. AR 60-61.

For the second hypothetical, the ALJ changed the lifting limitations to ten pounds on occasion and five pounds frequently. The VE testified that these limitations would prevent Tedford from performing the cashier and sales attendant jobs since they are categorized as light work. AR 61.

For the third hypothetical, the ALJ provided limitations of ten pounds on occasion, five pounds on a frequent basis, standing for two hours and sitting for six hours. *Id.* The individual could occasionally bend, stoop and kneel, had to refrain from working at heights, had limited overhead reaching and could not use the left hand for fine dexterity. *Id.* The ALJ asked if there were other jobs available in the regional and national economy that such an individual could perform. The VE answered that the

jobs of an office helper and information clerk would be available in significant numbers. AR 61-62.

For the fourth hypothetical, the ALJ asked:

> [I]f a person were to have maybe two seizures per day in an eight hour day, wherein they would be in a passed out condition for five to fifteen minutes, and would then need to sleep for 30 minutes before they could again function, would there be any type of work that such a person could perform in the national economy?

AR 62-63. The VE answered "no." AR 63. Tedford's attorney asked the VE to reconsider the second hypothetical with additional limitations involving memory and concentration that would make it difficult for a person to count money and keep a drawer balanced. AR 63. The VE responded that a person who had difficulty balancing a drawer would not be able to sustain employment. *Id.*

Based on the testimony and the medical evidence in the record, the ALJ indicated that he thought consultative examinations should be performed for both mental and physical impairments. AR 64. Tedford's attorney agreed.

### *Summary of ALJ's Decision*

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2) The claimant has not engaged in substantial gainful activity since November 26, 2004, the alleged onset date. (20 CFR 404.1571 *et seq.*).

(3) The claimant has the following severe impairments: her condition status post transient ischemic attack with left sided weakness and numbness, migraines and pseudoseizures. (20 CFR 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1. (20 CFR 404.1520(d), 404.1525 and 404.1526)

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she needs to avoid work around open machinery and needs to stay away from all heights such as ladders and scaffolds. In addition, she has some limited range of motion with the left arm. Specifically, she cannot perform overhead reaching with the left arm but the left arm can be used as an assist. Further, her left hand cannot be used for fine fingering. She can perform occasional bending, stooping, kneeling and crawling.

(6)     The claimant is capable of performing past relevant work as a cashier and a sales attendant. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565) In addition, the vocational expert testified that the claimant could perform other work in the regional and National Economy examples of which are the following:

|   | In the regional economy | In the National Economy |
|---|---|---|
| 1. An office helper | 4,835 | 98,557 |
| 2. An information clerk | 3,715 | 85,417 |

(7)     The claimant has not been under a disability, as defined in the Social Security Act, from November 26, 2004, through the date of this decision.

The ALJ concluded Tedford's medically determinable mental impairments were nonsevere after analyzing the four functional areas known as the "paragraph B" criteria. AR 12. He found that she had mild limitations in these areas with no episodes of decompensation each of extended duration. The ALJ then summarized the evidence. AR 14.

The ALJ noted Tedford had left shoulder pain and surgery in 2004. She was placed on light duty restrictions following physical therapy after the surgery and while she complained of discomfort, she felt she had gained back full function in her shoulder after the surgery. *Id.* The doctor anticipated that she would be back to full duty in four weeks. AR 15.

The ALJ then analyzed Tedford's symptoms of weakness, dysarthria and dysphasia, beginning with the incident on November 26, 2004, when she was taken to the emergency room and treated with aggressive t-PA. *Id.* He noted that a MRI of her brain was normal. In December 2004, she experienced similar symptoms. However, a CT scan of her head was negative and there was no evidence of a stroke. *Id.* Other tests also came back normal. *Id.*

In February 2005, Tedford had further neuropsychological tests performed. The doctor concluded she was under significant emotional distress and she had a tendency of developing physical complaints while under stress. *Id.* Her primary care physician at that time explained that all testing had come back normal and she was advised to go back to her exercise routine and work. AR 16.

In March, Tedford underwent an orthopedic evaluation for her shoulder and hand for purposes of a worker's compensation claim. The doctor noted mild pain and weakness and residual median nerve mononeuropathy, but no significant limitations. *Id.* In April 2005, Tedford underwent a sleep study. The results showed she had mild sleep apnea and the doctor recommended she sleep on her side. In March 2006, an EEG captured one of Tedford's spells, but did not demonstrate any seizure activity and was considered normal. *Id.*

In October 2007, Tedford was evaluated at the Mayo Clinic. Her tests came back normal and the doctor concluded he could not label her spells or events as ischemic in etiology. *Id.* The ALJ then summarized the findings from the consultative examinations performed by Dr. Baker and Dr. Marky. AR 17-18.

The ALJ found Tedford not credible. AR 18. He reasoned that it appeared she exaggerated her symptoms and the extensive objective medical evidence repeatedly ruled out a history of strokes or seizures. However, the ALJ stated he gave her the benefit of the doubt in calculating her RFC. *Id.*

He noted that doctors considered her abnormal movements to most likely be psychogenic based on tests that were not consistent with any specific type of known movement disorder syndrome or disease. *Id.* Even when a test captured her abnormal movements, it did not reveal that she was having a seizure. He also noted that some of her symptoms were suppressed with distraction. Dr. Baker found that she only had mild limitations in her ability to perform mental work-related activities. After her surgery in 2004, she was released to light work duty. *Id.* The ALJ determined this evidence was consistent with the RFC provided and the findings of the Disability Determination Services. He discredited Tedford's husband for the same reasons he discredited Tedford and also because he had a pecuniary interest in the outcome. *Id.*

The ALJ concluded Tedford could return to her past work as a cashier and sales attendant under the RFC provided or could perform other work available in the national economy such as an office helper or information clerk. AR 19. For these reasons, he found her to be not disabled since November 26, 2004.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . .

in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

15

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See*

16

*Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *The Substantial Evidence Standard*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court

considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

*Discussion*

Tedford argues the ALJ erred in several aspects of his evaluation of the medical evidence. She argues that the ALJ assigned greater weight to the opinions of the consultative examiners rather than her treating physicians without good reasons for doing so. Tedford also argues that the ALJ should have recontacted her treating sources to seek additional evidence or clarification before ordering consultative examinations. Finally, she argues that the somatization disorder diagnosis was not sufficiently taken into account and the ALJ did not provide good reasons for discrediting her and her husband's testimony. I will address each argument separately below.

### A.    *Weight of Medical Opinions*

Tedford argues the ALJ did not give "great weight" to Dr. Pary's opinion that Tedford had a stroke involving her left upper and lower extremities and Dr. Fulgham's opinion that despite a negative EEG, someone can have a seizure disorder. She argues that it was error for the ALJ to rely on the opinion of Dr. Marky, the consultative examiner, in the face of these two treating source opinions, especially because Dr. Marky did not consider her migraines.

The Commissioner argues the ALJ properly considered all of the medical opinions when determining Tedford's RFC. She contends that Dr. Marky's opinion was consistent with the rest of the medical evidence in the record and there are no contrary medical opinions from Tedford's treating sources. Finally, the Commissioner points out the ALJ actually credited the evidence Tedford claims he ignored by finding that she had severe impairments of her condition status post transient ischemic attack with left sided weakness and numbness, migraines, and pseudoseizures.

It is important to first distinguish a medical opinion from medical evidence as the two are not synonymous under the regulations. "Medical opinions are statements . . . that reflect judgments about the nature and severity of your

19

impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2). Dr. Pary's conclusion that Tedford suffered a stroke and Dr. Fulgham's statement that it is possible for someone to have a seizure disorder despite a negative EEG are not "medical opinions" according to the regulations. They only identify the impairment (or possible impairment), but do not reflect a judgment about the nature or severity of Tedford's impairment. Even though they are not "medical opinions" the ALJ must still consider these statements in evaluating the medical evidence.

Tedford argues the ALJ should have given more weight to Dr. Pary's conclusion that Tedford suffered a stroke[2] and to Dr. Fulgham's statement that it is possible for someone to have a seizure disorder despite a negative EEG. The ALJ gave this evidence great weight. He listed one of Tedford's severe impairments as "condition status post transient ischemic attack with left sided weakness and numbness." AR 12. The ALJ also ordered a consultative examination to obtain additional evidence on Tedford's seizures. AR 64. Based on those results, he included pseudoseizures as a severe impairment and set forth limitations to eliminate workplace dangers for someone with such a condition. Nothing in the ALJ's decision suggests he discredited the evidence from Dr. Pary or Dr. Fulgham.

It was also reasonable for the ALJ to give great weight to Dr. Marky's opinion, who concluded that Tedford suffers from pseudoseizures and migraines. Despite these

---

[2] Tedford argues other medical evidence that suggests she never suffered a stroke is contrary to Dr. Pary's opinion. While that may be true with regard to Dr. Pary's *initial* opinion when he treated her for a stroke on November 26, 2004, he later reported testing had been negative for an embolic source. AR 483. Regardless of Dr. Pary's uncertainty as to what caused Tedford's stroke-like symptoms, the ALJ considered Tedford's condition as post transient ischemic attack.

impairments, she found Tedford exhibited normal movement and reflexes on physical exam. AR 797-98. The evidence from Dr. Marky is not contrary to the evidence from Dr. Pary who assessed that she was suffering acute onset of stroke in 2004, but later acknowledged that Tedford's abnormal movements were of unclear etiology and probably psychogenic. AR 18, 473, 531. Both he and Dr. Fulgham concluded that tests failed to show evidence of brain pathology or neurological disorder that could be causing her symptoms. There is no conflict in the medical evidence that would require the ALJ to weigh the opinions and provide reasons for discrediting certain opinions as Tedford suggests.

Tedford also argues the ALJ erred by relying on Dr. Marky's assessment because she did not take Tedford's migraines into account and did not set forth any specific physical limitations. Dr. Marky clearly considered Tedford's migraines. She specifically diagnosed Tedford with pseudoseizures and migraines. While she did not set forth any physical limitations, she performed a full physical exam noting five out of five for each area of the motor exam, two out of two for reflexes, and no abnormal movements. She also noticed Tedford extend her left hand when distracted. Dr. Marky did not list any physical limitations because it appears she found Tedford had none. Because Dr. Marky's assessment indicates all of Tedford's impairments were considered, she did not find any physical limitations during her exam, and her opinion is consistent with the rest of the medical evidence, the ALJ did not err by relying on her opinion in determining Tedford's RFC.

### B.    Whether ALJ Should Have Recontacted Treating Sources

Tedford argues the ALJ should have recontacted her treating sources, but she does not specify why. She cites and discusses at least six cases where a court has remanded a case to the ALJ with instructions to recontact the claimant's treating physicians. The reasoning for each of these cases is different and Tedford fails to explain why she believes remand is appropriate in this case beyond the general concept

21

that medical evidence from treating physicians is the best evidence of a claimant's limitations. The Commissioner argues there was no need to recontact treating physicians in this case because there were no medical opinions to weigh and they were not ambiguous or incomplete.

The issue Tedford seems to raise is whether the ALJ should have recontacted her treating physicians rather than ordering consultative examinations. The obligation to obtain additional medical evidence comes from the ALJ's duty to develop the record. *See Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) ("Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010). The ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). "The regulations do not require an ALJ to recontact a treating physician whose opinion is inherently contradictory or unreliable." *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006).

Generally, a consultative examination will not be ordered until every reasonable effort has been made to obtain evidence from a claimant's own medical sources. 20 C.F.R. § 404.1512(e). However, a consultative examination may be ordered "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R. § 404.1519a. Examples include: (a) when the additional evidence needed is not contained in the records of the claimant's medical sources, (b) when the evidence that may have been available from a treating source can no longer be obtained for reasons beyond the claimant's control, (c) when the evidence needed is highly technical or specialized medical evidence that is not available from the claimant's treating source, or (d) when

22

there is an indication of a change in the claimant's condition and the current severity of the impairment is not established.  *Id.*

Here, the ALJ ordered consultative examinations after the hearing.  He remarked there was limited medical evidence since March 2009 and that it conflicted with Tedford's testimony.  AR 63.  Earlier in the hearing, Tedford stated she did not agree with her doctor's opinion that she was not disabled.  AR 50.  She testified the only reason she kept seeing him despite her disagreement with his treatment was that she did not have insurance.  *Id.*  The ALJ stated:

> I'm wondering if in view of the fact that perhaps the type of medical treatment she is getting may not be the best, whether or not we should have a consultative examination both for the mental problems that she's suffering from in the light of memory particularly, as well as from the physical problems that she is suffering from.

AR 63.  The ALJ then asked Tedford's attorney if he was satisfied with the record or if he wanted further testing.  He stated Tedford did not object to further testing.  AR 64.  The ALJ ordered consultative examinations stating that he wanted her to be seen by a neurologist for her seizures and by a psychologist.  AR 64.  Tedford attended both consultative examinations.

I find that the ALJ did not err by ordering consultative examinations rather than recontacting her treating physicians under these circumstances.  Tedford testified she did not agree with her treating doctor's treatment or his assessment of her condition.  He was also not a specialist.  Tedford's previous treating physician had sent her to a specialist at Mayo Clinic.  The record lacked recent medical evidence from a specialist regarding Tedford's seizure-like symptoms.  Tedford also did not have a treating source for her mental impairment.  Tedford agreed to undergo consultative examinations when asked by the ALJ and did not request that the ALJ recontact her treating physicians at that time.  Under these circumstances, it was reasonable for the ALJ to order

consultative examinations rather than recontact Tedford's treating physicians to ensure the record was fully and fairly developed.

### C.     *Somatization Disorder Diagnosis and Credibility Determinations*

Tedford points out that Dr. Baker diagnosed her with somatization disorder,[3] and argues her physical impairments are no less severe because of their psychological origin.  She cites *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989) and *Jones v. Callahan*, 122 F.3d 1148 (8th Cir. 1997), which involved somatoform disorders and argues the ALJ must take her somatization disorder into account when assessing her credibility.

The Commissioner argues the ALJ properly considered Dr. Baker's evaluation, including his opinion that Tedford's impairments caused only mild limitations in work-related activities.  The Commissioner argues that even if Tedford has somatization disorder, the ALJ is required to look beyond the diagnosis and determine what credible limitations she has, which the ALJ did in this case.  The Commissioner points out that the ALJ considered Tedford's pseudoseizures as a severe impairment, but based on all the evidence, including the medical evidence and Tedford's testimony (which the ALJ expressly found to be not credible) the ALJ concluded that her impairments were not disabling.

Somatoform disorder can be disabling and lack of medical evidence to support any physical impairments is not an appropriate basis to reject subjective complaints because the nature of the mental impairment "causes [a claimant] to exaggerate [his or] her physical problems in [his or] her mind beyond what the medical data indicate." *See Easter*, 867 F.2d at 1130.  An ALJ may reject the subjective complaints of a claimant suffering from somatoform disorder, so long as "the ALJ explicitly considers the

---

[3] Somatoform disorders involve "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."  20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.07.  Somatization disorder is a type of somatoform disorder.

somatoform disorder and makes express findings regarding why the claimant's testimony is not credible." *Rodewald v. Astrue*, Civil No. 08-5911 (RHK/SRN), 2009 WL 1026286, at *22 (D. Minn. Apr. 16, 2009) (citing *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995)).

In *Easter*, the claimant asserted multiple ailments including hypertension, dizziness, loss of balance and staggering, blacking out, difficulty concentrating, blurring and double vision, severe headaches, seizures, numbness and tingling in her head and extremities, difficulty lifting and gripping objects, carpal tunnel syndrome, fibromyalgia, osteoarthritis, osteoporosis, obesity, respiratory problems, and general loss of stamina and muscle coordination. *Easter*, 867 F.2d at 1129. She had also been diagnosed with somatoform disorder, which caused her to experience her physical problems worse than they actually were. *Id.* The ALJ discredited Easter's complaints of pain, noting they were inconsistent with the clinical and nonmedical evidence except as it related to her somatoform disorder. *Id.* at 1130. The Eighth Circuit noted the ALJ failed to appreciate that the somatoform disorder itself was disabling in Easter's case and that "[a]ny shortcomings in the objective medical data that support[ed] her alleged physical ailments [was] irrelevant since her primary disorder, as clinically diagnosed, caus[ed] her to exaggerate her physical problems in her mind beyond what the medical data indicate[d]." *Id.* The Eighth Circuit also noted there was no suggestion in the record that Easter was malingering or pretending to experience her ailments. *Id.* As to the claimant's credibility, the court found the ALJ erred by giving insufficient weight to her somatoform disorder and focusing unduly on objective physical data without making an express finding that her testimony was not credible. *Id.* at 1131.

Here, the ALJ found Tedford's medically determinable mental impairments nonsevere, but her pseudoseizures severe. AR 12. In determining the claimant's RFC, the ALJ must consider the combined effects of both her severe and nonsevere medically determinable impairments. *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citing

25

20 C.F.R. § 404.1545(a)).  The ALJ evaluated Tedford's subjective allegations and expressly found "[t]he claimant is not a credible witness."  AR 18.  He reasoned that she appeared to exaggerate her symptoms and the objective medical evidence did not support a history of stroke and seizures.  *Id.*  However, he stated he had given Tedford the benefit of the doubt in determining her RFC.  AR 18.

I find that the ALJ did not adequately consider Tedford's somatization disorder, both at Step Two in determining whether she has a severe impairment and at Step Four in conducting his credibility analysis while determining her RFC.  First, and most fundamentally, the ALJ incorrectly stated that Dr. Baker "made no psychological diagnosis."  AR 18.  In fact, Dr. Baker listed somatization disorder as Tedford's Axis I diagnosis.  AR 811.  Having determined that a consultative mental examination was necessary, the ALJ overlooked this important finding.  This inaccuracy makes it clear that the ALJ did not understand the nature of her mental impairment at Step Two when he summarily characterized her "medically determinable mental impairments" as non-severe because they did not cause "more than minimal limitations in the claimant's ability to perform basic mental work activities."

The ALJ also failed to consider the impact of somatization disorder when assessing Tedford's credibility and her RFC.[4]  Although the ALJ expressly found that her allegations were not credible, his primary reasons for discrediting Tedford (exaggeration of symptoms and lack of objective medical evidence supporting symptoms) are indicative of the mental impairment itself.  This is troubling because the ALJ recognized that Tedford had pseudoseizures and her symptoms were "probably psychogenic," but he then used the psychological nature of her symptoms as a basis to discredit her.  This indicates he did not adequately consider her mental impairment.

---

[4] The ALJ's ruling makes no mention of somatization disorder, making it even more likely that he overlooked this diagnosis.  It is possible that he inadvertently considered Dr. Baker's 2008 report, which deferred any Axis I diagnosis (AR 688), rather than the 2010 report Dr. Baker prepared after his post-hearing consultative examination.

Exaggeration of symptoms and lack of objective medical evidence supporting physical symptoms are not good reasons for discrediting a claimant diagnosed with somatization disorder.

The ALJ's other reasons for discrediting Tedford are also inappropriate given the nature of her disorder.[5] He noted that Dr. Baker found only mild limitations in her ability to perform work-related activities. Although Dr. Baker concluded that Tedford's mental impairment caused only mild limitations in her ability to perform *mental* work-related activities, his assessment did not consider her ability to perform *physical* work-related activities, which is the type of activity most affected by somatization disorder. The ALJ also reasoned Tedford had not been taken to the hospital for prolonged "seizure" activity or injuries related to her "seizures." This fact is simply insignificant. Tedford testified that she spends most her day sitting or lying down to prevent injury in case of an unexpected seizure and she and her husband have been told not to come to the hospital unless the seizure lasts longer than normal. A claimant with a seizure disorder (whether psychogenic or not) should not be discredited because a seizure has never resulted in injury or because she follows doctors' orders. Finally, the ALJ reasoned that Tedford was released to light work duty following her left arm surgery. This fact is also insignificant since it occurred before Tedford's onset date and the date she began experiencing her current symptoms. In short, the ALJ's other stated reasons are not good reasons for discrediting Tedford's allegations.

Because the ALJ's Step Two finding and credibility determination did not take somatization disorder into account, his decision is not supported by substantial evidence in the record as a whole. This case must be remanded for the ALJ to reconsider the

---

[5] Tedford challenges the ALJ's consideration of her activities of daily living as she reported them to Dr. Baker during the 2008 evaluation. While this was a factor the ALJ considered, it was not heavily weighted in the credibility analysis. Its placement in the decision is amongst a broader discussion of the evidence in the record. The ALJ does not mention her daily activities after finding she was not a credible witness. Because the ALJ considered Tedford's daily activities but did not use them as a basis to discredit her, I find no error with the ALJ's treatment of that factor.

27

severity of Tedford's somatization disorder and her and her husband's credibility. The ALJ may obtain additional medical evidence and hold another hearing to more fully develop the record concerning Tedford's somatization disorder, if he finds it necessary. Ultimately, the ALJ will need to clarify his finding at Step Two regarding whether Tedford's somatization disorder is severe and reassess the credibility of Tedford's and her husband's subjective allegations in light of this impairment. The ALJ must provide other reasons if he finds their allegations are not credible.

## *Conclusion*

The ALJ did not consider the specific diagnosis of somatization disorder at Step Two or conduct an appropriate credibility analysis. As such, I must remand this case for further proceedings, including any necessary development of the record. The Commissioner's decision is hereby **reversed** and this case is **remanded** for further proceedings consistent with the above opinion.

**IT IS SO ORDERED.**

**DATED** this 2nd day of July, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE